# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAUL MORRIS, on behalf of all similarly situated former unitholders of SPECTRA ENERGY PARTNERS, LP, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2019-0097-SG |
| SPECTRA ENERGY PARTNERS (DE) GP, LP, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: June 27, 2019
Date Decided: September 30, 2019

Michael J. Barry and Michael T. Manuel, of GRANT & EISENHOFER P.A., Wilmington, Delaware; Peter B. Andrews, and Craig J. Springer, of ANDREWS & SPRINGER LLC, Wilmington, Delaware; OF COUNSEL: Jeremy Friedman, Spender Oster, and David Tejtel, of FRIEDMAN OSTER & TEJTEL PLLC, New York, NY, *Attorneys for Plaintiff* .

Robert S. Saunders, Ronald N. Brown, III, and Ryan M. Lindsay, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; OF COUNSEL: Noelle M. Reed, Daniel S. Mayerfeld, and Alston L. Walker, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Houston, Texas, *Attorneys for Defendant*.

GLASSCOCK, Vice Chancellor

This is the second incarnation of a challenge—by a unitholder of a master limited partnership—to a buyback (a "reverse dropdown") of partnership assets formerly purchased from the controller of the partnership's general partner. The first litigation in the matter alleged that a special committee appointed by the general partner consented to the transaction in violation of its contractual duty of good faith, at an inadequate price. That litigation was brought in pertinent part derivatively, and survived a motion to dismiss.[1] Standing to pursue the matter was lost, however, when the controller acquired the partnership via merger.

The Plaintiff then brought this challenge to that merger, alleging that the general partner agreed to the merger in bad faith, in that it failed to receive any value for the derivative litigation asset. Generally, the litigation assets of an entity, like any other asset, pass to an acquirer. The former derivative plaintiff can, as a stockholder or unitholder, challenge the fairness of the merger in general directly, but she may not continue to litigate the derivative claim itself. The question arises, where a former derivative plaintiff seeks to pursue loss of the claim post-merger, whether the new complaint remains derivative in nature, in which case the plaintiff lacks standing, or whether it represents a direct attack on the merger itself.

In limited circumstances, a former derivative plaintiff has standing to contest the merger directly, on the ground that it wrongfully extinguished the derivative

---

[1] *Morris v. Spectra Energy Partners (De) GP, LP*, 2017 WL 2774559 (Del. Ch. June 27, 2017).

1

claim. Those cases involve the situation where the entity's fiduciaries have permitted a material litigation asset to be extinguished in the merger process, without value to the stockholders or unitholders. In such a situation, the plaintiff may have standing to pursue a claim for the wrongful destruction of the asset. The analysis as to whether a plaintiff can pursue such a claim directly, post-merger, is set out, consistent with our Supreme Court's opinion in *Parnes v. Bally Entertainment*,[2] in this Court's *Primedia* decision.[3] *Primedia* provides a three-part test for standing to pursue a direct claim challenging a merger price solely on failure to obtain value for a derivative litigation asset: Was the underlying claim viable? Was its value material in light of the merger consideration? Did the company fail to receive value for the claim in the merger because the buyer would not be willing to pursue it?

The Defendant has moved to dismiss, arguing that the Plaintiff does not pass the *Primedia* test, and therefore lacks standing; and that in any event he has failed to state a claim on which relief can be granted.

I find that the value of the derivative claim here was not material in light of the merger transaction. The derivative claim asserted that in determining that the reverse dropdown was fair to the partnership, the derivative defendants erred in netting out from known value a reduction of future payments to the general partner

---

[2] *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243 (Del. 1999).
[3] *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455 (Del. Ch. 2013).

avoided due to the reverse dropdown. According to the derivative complaint, the assets, valued at $1.5 billion, were undersold by $554 million. That is not the value of the claim to the partnership, however. The potential value must be reduced to reflect the minority unitholders' interest, as well as the prospect of ultimate recovery in light of the difficulties of proof inherent therein. Upon consideration, I find the amount at issue not material to the partnership. Therefore, the Plaintiff lacks standing and the Motion to Dismiss must be granted. Accordingly I need not reach the Defendant's argument under Rule 12(b)(6). My reasoning follows.

## I. BACKGROUND[4]

### A. *The Parties and Relevant Non-parties*

The Plaintiff, Paul Morris, owned common units of Spectra Energy Partners, LP ("SEP" or the "Partnership") at all relevant times through December 17, 2018, when all outstanding public units of SEP were converted into common shares of Enbridge, Inc. ("Enbridge").[5] He brings this action directly as a class action on behalf of all owners of SEP public units during the period beginning May 17, 2018 through December 17, 2018.

---

[4] The facts, except where otherwise noted, are drawn from the well-pled allegations of the Plaintiff's Verified Class Action Complaint (the "Complaint" or "Compl.") and exhibits or documents incorporated by reference therein, which are presumed true for purposes of evaluating the Defendant's Motion to Dismiss. The parties agreed that documents produced in response to Plaintiff's October 2018 books and records demand are incorporated into the Complaint.

[5] Compl. ¶ 15.

Non-party SEP is a Delaware master limited partnership ("MLP"). Prior to their conversion to common shares of Enbridge, SEP's common units traded on the New York Stock Exchange ("NYSE"). The Defendant, Spectra Energy Partners (DE) GP, LP ("SEP GP"), is a Delaware limited partnership and the general partner of SEP.[6] SEP GP is controlled by its own general partner, non-party Spectra Energy Partners GP, LLC ("SEP GP LLC"), a Delaware limited liability company.[7] SEP GP LLC's Board of Directors manages SEP.[8]

Non-party Enbridge is the ultimate parent of SEP and a pipeline and energy transportation company that owns interests in pipeline systems throughout North America.[9] Prior to their conversion to common shares of Enbridge, 83% of SEP's outstanding units were owned by Enbridge.[10] Further, SEP GP is a "wholly owned subsidiary" of Enbridge.[11] Enbridge's predecessor-in-interest as concerns all entities relevant here was Spectra Energy Corp ("SE Corp").[12] Enbridge acquired SE Corp in February 2017 in a stock-for-stock merger transaction.[13]

---

[6] *Id.* ¶ 16.
[7] *Id.* I will adopt the Complaint's shorthand and simply refer to SEP GP and SEP GP LLC together as "SEP GP" for clarity.
[8] *Id.*
[9] *Id.* ¶ 24.
[10] *Id.* ¶ 1.
[11] *Id.* ¶ 16.
[12] *Id.* ¶ 1 n.1.
[13] *Id.* ¶ 24.

*B. The Reverse Dropdown Transaction*

  1. The Proposed Transaction

  A previous derivative suit challenging the transaction at the heart of this case survived a motion to dismiss in this Court in 2017.[14]  The opinion in that matter recites the facts fully; what follows are those facts sufficient to the issues here.[15]

  On September 8, 2015, SE Corp and Phillips 66 announced that they would contribute certain assets to DCP Midstream, LLC ("DCP"), an existing 50/50 joint venture between the two companies.[16]  Phillips 66 would contribute $1.5 billion[17] and SE Corp would contribute two assets: a one-third interest in both DCP Sand Hills Pipeline, a long haul natural gas pipeline running from the Permian Basin to Mont Belvieu, Texas ("Sand Hills"), and DCP Southern Hills Pipeline, a long haul natural gas pipeline running from southern Kansas to Mont Belvieu, Texas ("Southern Hills" and, together with Sand Hills, the "Pipeline Interests").[18]  Since both companies contributed half of DCPs' assets, the value of the Pipeline Interests implied by Phillips 66's cash contribution was $1.5 billion.

---

[14] *Morris v. Spectra Energy Partners (De) GP, LP*, 2017 WL 2774559 (Del. Ch. June 27, 2017).
[15] Interested readers may consult the memorandum opinion, *id*.
[16] Compl. ¶ 35.
[17] *Id*.
[18] *Id. See* Transmittal Aff. of Ryan M. Lindsay, Esq. in Support of Def. Spectra Energy Partners (DE) GP, LP's Opening Br. in Support of its Mot. to Dismiss the Verified Class Action Compl., D.I. 15 ["Lindsay Aff."], Ex. 32, Discussion Materials Prepared for the Conflicts Committee of Spectra Energy Partners, dated September 2015 [the "September 2015 Discussion Materials"], at SEPENB00001162.

At the time of this announcement, SEP owned the Pipeline Interests, requiring SE Corp to purchase them from SEP before it could contribute them to DCP.[19] Previously, in November 2013, SE Corp had transferred the Pipeline Interests, which it held at the time, to SEP in a dropdown transaction.[20] The proposed sale of the Pipeline Interests from SEP back to SE Corp was thus a "reverse dropdown" (the "Reverse Dropdown").[21]

Four days before the public announcement, on September 4, 2015, SE Corp proposed the Reverse Dropdown in a letter to SEP GP.[22] As consideration for the sale of the Pipeline Interests, SE Corp (through its affiliates) offered to (i) surrender 20 million SEP limited partner units to SEP for redemption (the "LP Unit Redemption") and (ii) waive its right to receive up to $4 million in incentive distribution rights ("IDRs") for twelve consecutive quarters (the "IDR Give-back").[23] On September 7, 2015, SEP GP authorized its Conflicts Committee via written consent to evaluate the Reverse Dropdown, and appointed J.D. Woodward

---

[19] Compl. ¶ 35.

[20] *Morris*, 2017 WL 2774559, at *3. A dropdown transaction refers to a transaction in which an MLP purchases assets from its general partner or a related entity. *Id*. at *2 n.19.

[21] *Id*. at *2.

[22] Compl. ¶ 37.

[23] *Id*. IDRs confer entitlement to distributions to the general partner of an MLP; they are a common mechanism among MLPs to incentivize the sponsor to maximize profitability of the partnership. *Id*. ¶ 32.

III ("Woodward") and Nora Mead Brownell ("Brownell"), both members of the SEP GP Board of Directors, to the Conflicts Committee (the "2015 Committee").[24]

## 2. Duties and Conflict of Interest Provisions in the Second A&R LPA

SEP's Second Amended and Restated Agreement of Limited Partnership (the "Second A&R LPA"),[25] in place at the time of the Reverse Dropdown,[26] imposes a general, overarching obligation of "good faith" on SEP GP and its Conflicts Committee whenever they "make [a] determination or take or decline to take such other action . . . ."[27] Under the Second A&R LPA, in order for a determination to be made in "good faith," the person acting "must believe that the determination or other action is in the best interests of the Partnership."[28] That is, subjective good faith is the applicable standard for SEP GP and its Conflicts Committee.[29]

---

[24] *Id.* ¶ 38.

[25] Lindsay Aff., Ex. 30, Second Amended and Restated Agreement of Limited Partnership of Spectra Energy Partners, LP [the "Second A&R LPA"].

[26] Compl. ¶ 1 n.2.

[27] Second A&R LPA § 7.9(b). Conflicts Committee is defined as "a committee of the Board of Directors of [SEP GP] composed entirely of two or more directors, each of whom (a) is not a security holder, officer or employee of [SEP GP], (b) is not an officer, director, or employee of any Affiliate of [SEP GP], (c) is not a holder of any ownership interest in the Partnership Group other than Common Units and (d) meets the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities and Exchange Act and the rules and regulations of the Commission thereunder and by the National Securities Exchange on which the Common Units are listed or admitted to trading." *Id.* § 1.1.

[28] *Id.* § 7.9(b).

[29] *Morris v. Spectra Energy Partners (De) GP, LP*, 2017 WL 2774559, *6 (Del. Ch. June 27, 2017).

Section 7.10 of the Second A&R LPA titled "Other Managers Concerning the General Partner" provides in subsection (b) that:

> [t]he General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisors selected by it, and any act taken or omitted to be taken in reliance upon the opinion (including an Opinion of Counsel) of such Persons as to matters that the General Partner reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith in accordance with such opinion.[30]

This provides a conclusive presumption of good faith to SEP GP when it acts in reliance on professional advisors.[31]

Section 7.9(a) of the Second A&R LPA provides four safe harbors in case of conflicts. That section states that:

> whenever a potential conflict of interest arises between [SEP GP] or any of its Affiliates, on the one hand, and [SEP] . . . on the other, any resolution or course of action by [SEP GP] or its Affiliates in respect of such conflict of interest . . . shall not constitute a breach of this Agreement . . . if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval,[32] (ii) approved by the vote of a majority of the Outstanding Common Units (excluding Common Units owned by [SEP GP] and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to [SEP] taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to [SEP]).[33]

---

[30] Second A&R LPA § 7.10.
[31] *Morris*, 2017 WL 2774559, at *7.
[32] Defined as "approval by a majority of the members of the Conflicts Committee." Second A&R LPA § 1.1.
[33] *Id.* § 7.9(a).

3. <u>The 2015 Committee Approves the Reverse Dropdown</u>

The 2015 Committee retained Simmons & Company International ("Simmons") as its financial advisor in connection with the Reverse Dropdown.[34] Simmons' initial presentation to the 2015 Committee contained the terms of the transaction and noted that the contribution of the Pipeline Interests by SE Corp "was designed and intended to match Phillips 66's $1.5 billion cash contribution."[35] The presentation identified three "Components of Value" that SEP would receive as consideration in the deal: (i) the LP Unit Redemption (valued at $832 million), (ii) the IDR Give-back (valued at $53 million)[36] and (iii) Reduced GP Cash Flow (valued at $575 million) (the "Reduced GP Cash Flow").[37] Reduced GP Cash Flow represented "reduced distributions from SEP after the sale of Sand Hills and Southern Hills" and was calculated as the product of "[t]he reduction in GP distributions and [t]he comparable GP transaction and trading multiples" (excluding the value of the IDR Give-back).[38]

---

[34] Compl. ¶ 39.

[35] *Id*. ¶ 40.

[36] The $53 million value for the IDR Give-back was a present value calculation based on the face value of $64 million over 16 quarters. The Give-back offer in the initial proposal to SEP was for twelve quarters and the Reverse Dropdown ultimately had a twelve quarter Give-back. It is unclear if the 16 quarter Give-back in this presentation was due to negotiation or was in error.

[37] September 2015 Discussion Materials, at SEPENB00001187. The Reduced GP Cash Flow was later clarified to be $525 million. *See* Lindsay Aff., Ex. 33, Discussion Materials Prepared for the Conflicts Committee of Spectra Energy Partners, dated October 2015 [the "October 2015 Discussion Materials"], at SEPENB00001242.

[38] September 2015 Discussion Materials, at SEPENB00001187. The reduced distributions were "expected reductions in future payments from SEP to SEP GP as SEP became less profitable upon

9

In a following presentation in October 2015, Simmons moved Reduced GP Cash Flow to the appendix and the "Value of Consideration" section included only the LP Unit Redemption and the IDR Give-back with a combined aggregate value of $946 million.[39] On October 7, 2015 Simmons delivered a fairness opinion on the terms of the Reverse Dropdown and the 2015 Committee recommended that the SEP GP Board of Directors approve the Reverse Dropdown.[40] On October 8, 2015 the SEP GP Board of Directors approved the Reverse Dropdown.[41]

Under the final terms of the Reverse Dropdown, SEP agreed to transfer the Pipeline Interests to subsidiaries of SE Corp in exchange for (i) 21.56 million limited partner units,[42] (ii) the redemption of 440,000 general partner units,[43] and (iii) a

---

the removal of the assets." *Morris v. Spectra Energy Partners (De) GP, LP*, 2017 WL 2774559, *4 (Del. Ch. June 27, 2017).

[39] Compl. ¶ 45; October 2015 Discussion Materials, at SEPENB00001230.

[40] Compl. ¶ 46.

[41] *Id*.

[42] This was an increase from 20 million limited partner units in the initial proposal on September 4, 2015. This was a response to the "[i]mmediate negative market response" upon the public announcement of the Reverse Dropdown, triggering a drop in the SEP unit price. Compl. ¶ 47 n.17.

[43] Lindsay Aff., Ex. 44, Press Release: Definitive Agreements Executed for Contributions of Sand Hills and Southern Hills Natural Gas Liquids Pipeline Interests to DCP Midstream, dated October 19, 2015, at SEPENB00002314. While the Complaint does not mention the redemption of 440,000 general partner units, I noted in the memorandum opinion in the underlying case that "[t]he 440,000 general partner units cancelled as part of the [Reverse Dropdown] was allegedly 'a product of keeping SE Corp's 2% GP interest constant when reducing the number of outstanding LP units' as a result of the LP Unit Redemption. Historically, SEP has allowed SE Corp to 'acquire additional GP units at the same price as LP units as necessary in order to maintain a 2% general partnership interest in SEP.' The general partner units were thus implicitly valued on par with the limited partner units. Since Simmons valued the limited partner units in the LP Unit Redemption at $41.95 per unit, the implied valuation of the 440,000 general partner units would be, at most, roughly $18,458,000. Whether or not the GP Unit Redemption was properly excluded from

10

reduction in IDRs payable to SEP GP of $4 million per quarter through September 30, 2018.[44]

*C. The Plaintiff's Derivative Suit*

On December 18, 2015 the Plaintiff served a books and records demand upon SEP pursuant to the Second A&R LPA and 6 *Del. C.* §17-305 (the "2015 Demand).[45] After review of the documents in response to the 2015 Demand, the Plaintiff filed a Verified Class Action and Derivative Complaint (the "Derivative Complaint") in this Court on March 16, 2016 (the "Derivative Litigation").[46] The crux of the Derivative Complaint was its contention that SEP only received value in the Reverse Dropdown in the form of the LP Unit Redemption and IDR Give-back (worth a combined $946 million) and, consequently, SEP did not receive sufficient value for the Pipeline Interests valued at $1.5 billion.

The Plaintiff pled three derivative claims: Count II asserted a breach of the Second A&R LPA against SEP GP, alleging that SEP GP breached its "good faith" obligation by approving the Reverse Dropdown;[47] Count IV asserted a breach of the

---

Simmons' estimate of the total value of consideration is not material to this dispute at the pleading stage." *Morris*, 2017 WL 2774559, at *5 n.49 (internal citations omitted).

[44] Compl. ¶ 47. This represents twelve quarters including the quarter that the Reverse Dropdown was consummated. The Plaintiff does not allege that the final IDR Give-back was less than the initial proposal.

[45] *Id.* ¶ 48.

[46] *Id.*

[47] The Plaintiff also argued SEP GP acted in bad faith by "improperly constraining" the 2015 Committee's authority to a determination whether the Reverse Dropdown would hold SEP "net cash neutral." *Morris*, 2017 WL 2774559, at *8. This argument was based on the written consent

11

implied covenant of good faith and fair dealing against SEP GP; and Count VI asserted tortious interference with the Second A&R LPA against SE Corp.[48]

SEP GP and SE Corp moved to dismiss the Derivative Complaint pursuant to Court of Chancery Rule 12(b)(6).[49]  I granted SEP GP's motion to dismiss Count IV[50] and SE Corp's motion to dismiss Count VI.[51]

I declined to grant the motion to dismiss Count II claim alleging a breach of the Second A&R LPA (the "Derivative Claim").[52]  I noted that at that stage in the proceedings "[t]he record [was] insufficient to determine the nature of the alleged IDR savings from the sale of Sand and Southern Hills and whether it was properly understood as value of consideration to SEP."[53]  Drawing all reasonable inferences in favor of the Plaintiff, I found that the Derivative Complaint "made adequate allegations showing that under reasonably conceivable circumstances a facially unreasonable gap in consideration exists sufficient to infer subjective bad faith."[54]

---

authorizing the 2015 Committee, which read in part: "WHEREAS, the Company has received a formal non-binding proposal from Spectra Corp in which Spectra Corp has proposed that the Partnership transfer its membership interests in Sand Hills and Southern Hills to Spectra Corp in exchange for certain consideration from Spectra Corp to the Partnership, with the aim of holding the Partnership net cash neutral (the 'Transaction')." *Id*. at *4.

[48] *Id*. at *8.  Counts I, III and V, direct claims on behalf of the class, were abandoned by the Plaintiff due to a then-recent clarification of the law by our Supreme Court.

[49] *Id*.

[50] *Id*. at *17.

[51] *Id*. at *18.

[52] *Id*. at *16.

[53] *Id*.

[54] *Id*.

12

I concluded that it was "reasonably conceivable that the General Partner acted in subjective bad faith."[55]

Following my denial of the motion to dismiss as to the Derivative Claim and until August 2018 the parties undertook fact and expert discovery in the Derivative Litigation.[56] On September 4, 2018 SEP GP moved for summary judgment on the Derivative Claim.[57] The summary judgment motion was pending when on March 26, 2019 the Derivative Claim was dismissed with prejudice for reasons explained below.

*D. The Roll-Up Transaction*

### 1. The Proposed Transaction

On March 15, 2018 the Federal Energy Regulatory Commission ("FERC") announced plans to revise a policy to no longer allow pipeline MLPs such as SEP to "recover an income tax allowance in their cost of service."[58] The market viewed this as a negative development for MLPs; SEP's trading price declined by twenty percent within a week.[59] On March 16, 2018 SEP and Enbridge issued press releases stating they "anticipate[d] no immediate impact to [SEP's] current gas pipeline cost of service rates as a result of the revised policy" and that "[a]ny unmitigated impacts

---

[55] *Id.*
[56] Compl. ¶ 51.
[57] Def. Spectra Energy Partners (DE) GP, LP's Mot. for Summ. J., *Morris v. Spectra Energy Partners (De) GP, LP*, C.A. No. 12110-VCG (Del. Ch. dismissed March 26, 2019), D. I. 118.
[58] Compl. ¶ 52.
[59] *Id.*

are not anticipated to materially change SEP's distributable cash flow outlook beyond 2018."[60] SEP changed tune on May 9, 2018 in its first quarter 2018 earnings release filed with the SEC, noting that "[t]he change in FERC's policy has had a negative impact on the MLP sector" and that it would attempt to mitigate the impact of the policy change.[61]

On May 17, 2018 Enbridge offered SEP's public unitholders 1.0123 common shares of Enbridge in exchange for each publicly held common unit of SEP based on the closing price of SEP common units and Enbridge common shares on the NYSE on May 16, 2018 (the "Roll-Up").[62] Plaintiff contends that this was an "opportunis[tic]" attempt to "squeeze out SEP's public unitholders" as "SEP's trading price [was] still artificially depressed."[63] SEP's closing price was $33.10 per unit on May 16, 2018 and Enbridge's price was $32.70 per common share.[64] Enbridge's offer was conditioned on approval by SEP GP's Conflicts Committee.[65] After receiving Enbridge's offer letter, the SEP GP Board of Directors authorized its Conflicts Committee (the "2018 Committee") to consider the Roll-Up and to provide

---

[60] *Id.* ¶ 53. As noted above, Enbridge acquired SE Corp in February 2017 in a stock-for-stock merger transaction and was the ultimate parent of SEP and SEP GP for the timeframe relevant to the Roll-Up.

[61] *Id.*

[62] *Id.* ¶ 54.

[63] *Id.*

[64] *Id.* At these prices and with the offered exchange rate, SEP's public unitholders would receive Enbridge common stock worth $33.10 at market close on May 16, 2018 in exchange for their SEP units worth $33.10 at market close on May 16, 2018.

[65] *Id.*

Special Approval.[66] The 2018 Committee consisted of Woodward and Brownell (both of the 2015 Committee) and Michael G. Morris, a fellow member of the SEP GP Board of Directors.[67]

### 2. The 2018 Committee Approves the Roll-Up and Values the Derivative Claim at Avoided Costs

On May 18, 2018 the Plaintiff's counsel in the Derivative Litigation, Grant & Eisenhofer P.A. and Friedman Oster & Tejtel PLLC (collectively with Andrews & Springer LLC, "Plaintiff's Derivative Counsel") sent a letter to the 2018 Committee detailing support for the Plaintiff's valuation of the Derivative Claim of over $500 million and requesting a meeting with the 2018 Committee to discuss the Derivative Claim.[68] Because the Derivative Claim is considered under Delaware law to be a corporate asset, the purpose of the Plaintiff's letter was to ensure the asset was assigned proper value in determining whether the exchange ratio offered by Enbridge was in the best interests of SEP. The letter noted that the offer proposed on May 17, 2018 was "woefully inadequate in that it fails to provide SEP and its

---

[66] *Id.* ¶ 55. At this time, SEP's governing document was the Third Amended and Restated Agreement of Limited Partnership; the definition of "Special Approval" in this agreement is identical to the same definition in the Second A&R LPA. *See* Second A&R LPA §1.1; Lindsey Aff., Ex. 1, Spectra Energy Partners, LP, Current Report (Form 8-K) (Jan. 22, 2018) Ex. 3.1, Third Amended and Restated Agreement of Limited Partnership of Spectra Energy Partners, LP [the "Third A&R LPA"] §1.1.

[67] Compl. ¶ 55.

[68] *Id.* ¶ 60. *See* Lindsay Aff., Ex. 63, Letter from counsel for Paul Morris to the members of the Conflicts Committee of Spectra Energy Partners (DE) GP, LP [the "Letter to the 2018 Committee"].

public unitholders with any value associated with the Derivative Claim" and further informed the 2018 Committee that it had an "unwavering duty to act in good faith" that could only be "discharge[d] . . . by ensur[ing] that SEP (and its unaffiliated LP unitholders) receive appropriate value for the Derivative Claim."[69]

The 2018 Committee retained Sidley Austin LLP ("Sidley Austin") as its legal advisor[70] and Jefferies LLC ("Jefferies") as its financial advisor[71] in connection with its review of the Roll-Up.

On July 18, 2018, FERC finalized the aforementioned policy change, but contrary to initial expectations it did not "meaningfully limit an MLP's ability to recover an income tax allowance in its cost of service."[72] SEP's public units realized a corresponding increase in market price.[73]

On July 20, 2018, the Defendant's counsel in the Derivative Litigation, Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden") met with the 2018

---

[69] Letter to the 2018 Committee, at 3.

[70] Lindsay Aff., Ex. 8, Minutes of the Special Meeting of the Conflicts Committee to the Board of Directors of Spectra Energy Partners GP, LLC, dated May 23, 2018 [the "May 23, 2018 Minutes"], at 2. *See* Compl. ¶ 61.

[71] Lindsay Aff., Ex. 9, Minutes of the Special Meeting of the Conflicts Committee to the Board of Directors of Spectra Energy Partners GP, LLC, dated May 29, 2018 [the "May 29, 2018 Minutes"], at 1. *See* Compl. ¶ 62.

[72] Compl. ¶ 57.

[73] *Id.* The Complaint does not indicate the market price of SEP public units after July 18, 2018 but it does note that the ratio of SEP's unit price to Enbridge's stock price increased from 1.018529 on March 16, 2018, the day following the original announcement of the policy change to 1.056746 following the finalization of the policy change, presumably reflecting the respective market prices.

Committee regarding the Derivative Litigation.[74] Plaintiff alleges that Skadden "acknowledged" that Simmons "relegated any supposed value from Reduced GP Cash Flow to the appendix" of their discussion materials, "incorrectly stated that the [Pipeline Interests] were 'financially challenged'" at the time of the Reverse Dropdown, and "mischaracterized the *pro forma* financial analysis done by Simmons in connection with the Reverse Dropdown."[75] The 2018 Committee asked Skadden to "express their degree of confidence that the defendant in the [Derivative Litigation] would prevail if the case were to go to trial."[76] Skadden "declined to quantify the defendant's chance of success" but "noted that the [Derivative Claim] had no merit and that the defendants should have a strong chance at success."[77] Skadden "emphasized that there was no evidence that the [2015 Committee] had not possessed the subjective belief that the [Reverse Dropdown] was in the best interests of the Partnership."[78]

On July 26, 2018, Plaintiff's Derivative Counsel met telephonically with Sidley Austin and Jefferies in their respective capacities as legal and financial

---

[74] *Id.* at ¶ 62. *See* Lindsay Aff., Ex. 13, Minutes of the Special Meeting of the Conflicts Committee to the Board of Directors of Spectra Energy Partners GP, LLC, dated July 20, 2018 [the "July 20, 2018 Minutes"], at 1.
[75] Compl. ¶ 62.
[76] July 20, 2018 Minutes, at 5.
[77] *Id.*
[78] *Id.*

advisors to the 2018 Committee regarding the Derivative Litigation.[79]  Plaintiff's

Derivative Counsel also provided discussion materials to Sidley Austin and Jefferies

discussing the Reverse Dropdown, "the applicable legal standards under Delaware

law," and, according to Plaintiff's Derivative Counsel, "the reasons there was a

significant likelihood that SEP GP would be held liable for breaching the Partnership

Agreement by agreeing to the Reverse Dropdown, and an analysis of the damages

in the [Derivative Litigation]."[80]

At a meeting of the 2018 Committee on August 3, 2018, Sidley Austin noted

that Plaintiff's Derivative Counsel had made a telephonic presentation to themselves

and Jefferies and provided a slide presentation summarizing their arguments and

reports from the Plaintiff's expert James Read.[81]  The 2018 Committee discussed the

status of the Derivative Litigation with its advisors and determined that "if the [Roll-

Up] were consummated, the Partnership would receive a benefit in avoiding the

continuing litigation costs associated with the [Derivative] Litigation, so that the

amount of such avoided costs would represent modest incremental value that the

Partnership would obtain through the [Roll-Up]."[82]  In other words, the 2018

---

[79] Compl. ¶ 64; *See* Lindsay Aff., Ex. 16, Minutes of the Special Meeting of the Conflicts Committee to the Board of Directors of Spectra Energy Partners GP, LLC, dated Aug, 3, 2018 at 10:00 am [the "August 3, 2018 Minutes"].
[80] Compl. ¶ 64.
[81] August 3, 2018 Minutes, at 1.
[82] *Id*. at 4–5.

18

Committee determined that the value of the Derivative Claim, net of defense costs, was less than $0.

At a meeting the following day, August 4, 2018, the 2018 Committee continued to discuss the Derivative Litigation. The 2018 Committee "confirmed its preliminary determination that the Reduced GP Cash Flows should be included" as a component of the consideration in the Reverse Dropdown and that "the total value of consideration received by Partnership [sic] in the [Reverse Dropdown], including the Reduced GP Cash Flows, was approximately $1.5 billion."[83] The 2018 Committee then determined that the Derivative Litigation "did not have any value to the Partnership, other than the modest incremental value from the avoidance of continuing ligation costs that would otherwise be incurred as a result of the extinguishment of such derivative claim upon the consummation of the [Roll-Up]."[84] The 2018 Committee determined it should attribute $4 million of value to SEP that would "result from the avoidance of continuing litigation costs through the extinguishment of the [Derivative Claim]" and asked Jefferies to "reflect that incremental $4 million in subsequent updates of its financial analyses."[85]

---

[83] Lindsay Aff., Ex. 18, Minutes of the Special Meeting of the Conflicts Committee to the Board of Directors of Spectra Energy Partners GP, LLC, dated Aug, 4, 2018 [the "August 4, 2018 Minutes"], at 4.
[84] *Id.*
[85] *Id.*

At a meeting of the 2018 Committee on August 16, 2018, a revised offer was announced from Enbridge with an exchange ratio of 1.09 Enbridge common shares per SEP common unit.[86] In communicating this offer, Enbridge's representative indicated that the revised offer "ascribed no value" to the Derivative Claim.[87] The 2018 Committee noted that it had "previously determined that the value of the [Derivative Claim] . . . was limited to the costs of continued litigation that would be avoided . . . upon consummation of the [Roll-Up]" and that "Enbridge had indicated that approximately $4.0 million had been reserved for such costs."[88] The 2018 Committee directed Jefferies to confirm that the $4 million in negative value "would be taken into account in its valuation analyses of the Partnership."[89]

On August 17, 2018 the 2018 Committee met to discuss another offer by Enbridge, this time for 1.11 Enbridge common shares per SEP common unit.[90] Jefferies urged the 2018 Committee to "make a final counter offer of 1.111x to Enbridge so that the last offer in the negotiation of the [Roll-Up] would be made by

---

[86] Lindsay Aff., Ex. 20, Minutes of the Special Meeting of the Conflicts Committee to the Board of Directors of Spectra Energy Partners GP, LLC, dated Aug, 16, 2018 [the "August 16, 2018 Minutes"], at 1.
[87] *Id*.
[88] *Id*. at 3. That is, Enbridge had earmarked $4 million of litigation costs to defend the Derivative Litigation.
[89] *Id*.
[90] Lindsay Aff., Ex. 21, Minutes of the Special Meeting of the Conflicts Committee to the Board of Directors of Spectra Energy Partners GP, LLC, dated Aug, 17, 2018, at 1. Jefferies noted that an exchange ratio of 1.11 Enbridge common shares per SEP common unit was "comfortably above the level at which Jefferies was prepared to opine as to the fairness, from a financial point of view, of the [Roll-Up]." *Id*.

the [2018 Committee], which Jefferies said they were confident that Enbridge would accept."[91]  Further, "[i]n response to a question that was raised, Jefferies confirmed that . . . the incremental value to the Partnership related to the [Derivative Claim] . . . was so small in comparison to the total value of the Partnership that there would be no meaningful impact on the exchange ratio."[92]  Ultimately, the 2018 Committee decided to accept an exchange ratio of 1.111 Enbridge common share per SEP common unit "assuming Enbridge accepted the [2018 Committee's] final counteroffer."[93]

On August 23, 2018, the 2018 Committee passed a resolution, and resolved in part that it "determine[d] in good faith that the [Roll-Up] . . . is fair and reasonable to, and in the best interest of, the Partnership and the Public Unitholders."[94]  The 2018 Committee "approve[d] the [Roll-Up]" and "recommend[ed] that the Board approve the [Roll-Up]."[95]

On August 24, 2018, SEP announced that it had entered into a definitive merger agreement with Enbridge (and its wholly-owned subsidiaries) "whereby Enbridge would acquire all publicly held SEP units at an exchange ratio of 1.111

---

[91] *Id.*
[92] *Id.* at 1–2.
[93] *Id.* at 2.
[94] Lindsay Aff., Ex. 22, Minutes of the Special Meeting of the Conflicts Committee to the Board of Directors of Spectra Energy Partners GP, LLC, dated Aug, 23, 2018, Ex. B, Resolutions of the Conflicts Committee of the Board of Directors of Spectra Energy Partners GP, LLC, at SEPENB00000216.
[95] *Id.*

shares of Enbridge stock for each publicly held unit of SEP."[96]  The Roll-Up was not subject to majority of minority approval.[97]

The Roll-Up was approved by SEP's unitholders on December 13, 2018 by a 435,055,449 to 2,940,813 vote with 141,914 units abstaining.[98]  Enbridge-affiliated entities held 402,989,862 units of the 484,896,871 units outstanding at the time of the vote (approximately 83%).[99]  Of the 89,907,009 publicly held units, 32,065,987 units (approximately 39%) voted in favor of the Roll-Up.[100]

### E. The Derivative Claim is Dismissed

Subsequent to the closing of the Roll-Up, SEP GP moved to dismiss the Derivative Claim arguing that the Plaintiff lost standing to pursue that claim under the continuous ownership requirement set forth in *Lewis v. Anderson*: "[a] plaintiff who ceases to be a shareholder, whether by reason of merger or for any other reason, loses standing to continue a derivative suit."[101]  In its reply brief to SEP GP's motion to dismiss, the Plaintiff acknowledged that "[f]ollowing and as a result of the Roll-Up Transaction, Enbridge is the sole owner of all common units of Spectra Energy"

---

[96] Compl. ¶ 58.
[97] *Id.*
[98] *Id.* ¶ 59.
[99] *Id.*
[100] *Id.*
[101] Def. Spectra Energy Partners (DE) GP, LP's Br. in Support of its Mot. to Dismiss the Verified Class Action and Derivative Compl. at 5, *Morris v. Spectra Energy Partners (De) GP, LP*, C.A. No. 12110-VCG (Del. Ch. dismissed March 26, 2019), D. I. 128 (quoting *Lewis v. Anderson* 477 A.2d 1040, 1039 (Del. 1984)).

and noted that "[a]s the owner of the claim, Enbridge should be allowed to determine whether to prosecute it against Defendants [sic]."[102]

On March 26, 2019, I granted the parties' Stipulation and Proposed Order dismissing the Derivative Claim with prejudice.[103] The Order did not preclude the Plaintiff from prosecuting this Action.[104]

### F. Procedural Background of this Action

The Plaintiff made a books and records demand on SEP on October 8, 2018.[105] The Plaintiff filed the Verified Class Action Complaint (the "Complaint") on February 8, 2019.[106] The Defendant filed a Motion to Dismiss the Complaint on April 8, 2019.[107] I heard Oral Argument on the Motion to Dismiss on June 27, 2019, and considered the Motion submitted for decision on that date.

The Complaint pleads two counts. Both are pled as direct claims.

Count I asserts breach of SEP's Third Amended and Restated Agreement of Limited Partnership (the "Third A&R LPA") against SEP GP. It alleges that SEP GP "allowed Enbridge to engineer the [Roll-Up] on terms that were patently unfair

---

[102] Pl.'s Resp. to Spectra Energy Partners (DE) GP, LP's Mot. to Dismiss ¶ 5, *Morris v. Spectra Energy Partners (De) GP, LP*, C.A. No. 12110-VCG (Del. Ch. dismissed March 26, 2019), D. I. 131.

[103] Order Dismissing the Verified Class Action and Derivative Compl., *Morris v. Spectra Energy Partners (De) GP, LP*, C.A. No. 12110-VCG (Del. Ch. dismissed March 26, 2019), D. I. 137.

[104] *Id.*

[105] Lindsay Aff., Ex.64, Document Production and Confidentiality Agreement, at 1.

[106] Verified Class Action Compl., D.I. 1.

[107] Def.'s Opening Br. in Supp. of its Mot. to Dismiss the Verified Class Action Compl., D.I. 15 ["Def.'s Opening Br."].

and unreasonable to SEP and its public unitholders" and that were not approved in good faith by the 2018 Committee or the SEP GP Board of Directors.[108] The basis of this claim is that the 2018 Committee and the SEP GP Board of Directors as a whole failed to "attempt to (i) appropriately value the Derivative Claim, or (ii) secure any value for the Derivative Claim in its negotiations concerning the Roll-Up."[109]

Count II asserts breach of the implied covenant of good faith and fair dealing against SEP GP. The Plaintiff alleges that SEP GP violated the implied covenant of good faith and fair dealing when it (1) "allow[ed] Enbridge to engineer the [Roll-Up] on terms that are patently unfair and unreasonable to SEP," and (2) secured Special Approval using a "majority conflicted" committee that (i) did not appropriately value the Derivative Claim and (ii) failed to secure any value for the Derivative Claim.[110]

The Complaint does <u>not</u> challenge the fairness of the Roll-Up's exchange ratio, other than to allege failure to achieve value for the litigation asset.

## II. ANALYSIS

The Defendant has moved to dismiss the action pursuant to Chancery Court Rule 12(b)(6).[111] The standard of review for a Rule 12(b)(6) motion is well settled:

---

[108] Compl. ¶ 105.
[109] *Id.*
[110] *Id.* ¶ 110.
[111] Ch. Ct. R. 12(b)(6).

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[112]

When reviewing a motion to dismiss, the Court may take into consideration documents "incorporated into the pleadings by reference and may take judicial notice of relevant public filings."[113]

Standing is a predicate issue in any litigation.[114]  Since I find that the Plaintiff lacks standing, I do not reach the Defendant's Motion to Dismiss under Rule 12(b)(6).

Below I review both Counts of the Complaint.  For the reasons that follow I grant the Defendant's Motion in full.

*A. Standing Requirement for the Plaintiff's Claims*

As noted above, the Delaware Supreme Court held in *Lewis v. Anderson*[115] that a plaintiff who ceases to be a stockholder loses standing to pursue derivative litigation on behalf of the entity.

---

[112] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotations omitted).

[113] *See Fairthorne Maint. Corp. v. Ramunno*, 2007 WL 2214318, at *4 (Del. Ch. Jul. 20, 2007) (citations omitted).

[114] *E.g. Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

[115] 477 A.2d 1040 (Del. 1984).

In certain circumstances, Delaware law permits stockholders who lose standing under this scenario to directly challenge the fairness of the merger that extinguished their right to pursue the derivative litigation. These claims "embrace the holding of the Supreme Court's decision in *Parnes v. Bally Entertainment Corp.*,[116] which permits a plaintiff to attack a merger directly if the target board agreed to a materially inadequate, and therefore unfair, price because the price did not reflect the value of certain assets."[117]

*In re Primedia, Inc. Shareholders Litigation[118]* sets out the standing requirements under Delaware law for a plaintiff who attacks the fairness of a merger based on a "board's alleged failure to obtain value for an underlying derivative claim."[119] *Primedia* holds that a plaintiff seeking to pursue such a direct claim must establish standing to sue via a three-part test:

> First, the plaintiff must plead an underlying derivative claim that has survived a motion to dismiss or otherwise could state a claim for which relief could be granted. Second, the value of the derivative claim must be material in the context of the merger. Third, the complaint challenging the merger must support a pleadings-stage inference that the acquirer would not assert the underlying derivative claim and did not provide value for it.[120]

---

[116] 772 A.2d 1243 (Del.1999).
[117] *In re Massey Energy Co.*, 2011 WL 2176479, *17 (Del. Ch. May 31, 2011).
[118] 67 A.3d 455 (Del. Ch. May 10, 2013).
[119] *Id*. at 477.
[120] *Id*.

Only in those circumstances where a plaintiff can meet this three-part test will they be permitted to directly challenge the merger on the grounds that the price did not reflect the value of a material asset, the derivative claim.

Essential to any claim subject to *Primedia*'s standing requirements is that the plaintiff alleges that the merger itself was unfair. This Court noted in *In re Riverstone National, Inc. Stockholder Litigation*,[121] upon considering a challenge to standing under *Primedia*, that the "more fundamental" issue "is a direct challenge to the merger as unfair."[122] Thus, "[e]ven in a self-interested transaction in order to state a claim a shareholder must allege some facts that tend to show that the transaction was not fair."[123] Failure to obtain value for a material asset, the minority stockholders' share of a derivative claim, may be an adequate basis to render a merger unfair.[124]

The Plaintiff alleges that the Roll-Up was unfair because the 2018 Committee and SEP GP failed to "secure any value" for the Derivative Claim on behalf of SEP's public unitholders.[125] The 2018 Committee's own minutes reflect its determination that the Derivative Claim "did not have any value to [SEP], other than the modest

---

[121] 2016 WL 4045411 (Del. Ch. July 28, 2016).
[122] *Id.* at *1. *See Monroe City Emps.' Retirement Sys. v. Carlson*, 2010 WL 2376890, *2 (Del. Ch. June 7, 2010) (noting that "[f]air price, however, is often the paramount consideration.").
[123] *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, *5 (Del. Ch. Apr. 21, 1995).
[124] *Primedia*, 67 A.3d at 476 ("But the failure to obtain value for the *Brophy* claim in turn rendered the Merger unfair to Primedia's minority stockholders, because they only received value for their share of Primedia's operating business and not for their share of the Derivative Action.").
[125] Compl. ¶¶ 105–10.

27

[negative] incremental value from the avoidance of continuing ligation costs that would otherwise be incurred as a result of the extinguishment of such derivative claim upon the consummation of the [Roll-Up]."[126]  Based on this conclusion, the 2018 Committee and the SEP GP Board of Directors ultimately did not obtain any value for the Derivative Claim as a corporate asset.  The only value ascribed to the Derivative Claim by the 2018 Committee was cost savings from the cessation of the Derivative Litigation, an amount too small to affect the exchange ratio.  The Plaintiff alleges that the Derivative Claim had value,[127] and it is incontrovertible that the Defendant did not obtain value for the Derivative Claim and that the Plaintiff seeks to challenge the Roll-Up on this ground.  The Plaintiff, however, must first establish standing to pursue this challenge.

*B. The Plaintiff Does Not Have Standing*

1. The Derivative Claim Was Viable, and the Plaintiff's Class Received No Value for It

*Primedia*'s first prong dictates an inquiry into whether the underlying derivative claim was viable.  This can be answered in the affirmative when the "underlying corporate claim has survived a motion to dismiss or otherwise could state a claim on which relief could be granted."[128]  The wisdom behind this inquiry

---

[126] August 4, 2018 Minutes, at 4.
[127] Compl. ¶ 1.
[128] *Primedia*, 67 A.3d at 477.

28

is that if the underlying derivative suit lacks viability, then "there is no litigation asset to value or maintain, and likewise no value to divert to the controlling stockholder or other derivative action defendants."[129]   Survival of a motion to dismiss is an indicia that the underlying derivative suit is "meritorious."[130]

The Derivative Claim here survived a motion to dismiss in this Court.[131]  The record at that point was "insufficient to determine the nature of the alleged IDR savings from the Sand and Southern Hills and whether it was properly understood as value of consideration to SEP."[132]  Drawing all reasonable inferences in favor of the plaintiff in that motion to dismiss, I found that he "made adequate allegations showing that under reasonably conceivable circumstances a facially unreasonable gap in consideration exists sufficient to infer subjective bad faith" in breach of the Second A&R LPA.[133]

The Defendant urges me to evaluate the viability of the Derivative Claim "as of the date the Plaintiff's standing was extinguished."[134]  As of that date, December 17, 2018, the Defendant had moved for summary judgment on the Derivative

---

[129] *Id.*
[130] *Id.* (quoting *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 765 (Del. Ch. Jan 7, 1986)).
[131] Compl. ¶ 105.  *See Morris v. Spectra Energy Partners (De) GP, LP*, 2017 WL 2774559 (Del. Ch. June 27, 2017).
[132] *Morris*, 2017 WL 2774559, at *39.
[133] *Id.*
[134] Def.'s Opening Br., at 33.

Claim.[135]  The Defendant's summary judgment motion relied on discovery material and the Defendant argues that the "Plaintiff cannot now contend that this Court must assess the viability of his claim as if that summary judgment evidence did not exist."[136]

The Defendant's argument misconstrues the purpose of the viability inquiry, which seeks to identify only whether the underlying derivative suit is "meritorious." In discussing whether a claim is "meritorious," the Delaware Supreme Court has held that "[i]t is not necessary that factually there be absolute assurance of ultimate success, but only that there be some reasonable hope."[137]  Viability is a threshold inquiry.  If the complaint is devoid of actionable claims, the inquiry is at an end. *Primedia* asks whether the claim has "survived a motion to dismiss." The answer for the Derivative Claim is in the affirmative.  That is the end of the viability inquiry. The Defendant's argument that the facts favor a summary judgment is not pertinent to viability, but, obviously, may be pertinent to the materiality prong of the *Primedia* analysis, addressed below.

Likewise, the record reflects that the third *Primedia* prong was satisfied; the public unitholders received no value for the Derivative Claim.

---

[135] Def. Spectra Energy Partners (DE) GP, LP's Mot. for Summ. J., *Morris v. Spectra Energy Partners (De) GP, LP*, C.A. No. 12110-VCG (Del. Ch. dismissed March 26, 2019), D. I. 118.  SEP GP moved for summary judgment on September 4, 2018.
[136] Def.'s Opening Br., at 34.
[137] *In re Primedia Inc. S'holders Litig.*, 67 A.3d 455, 478 (Del. Ch. May 10, 2013) (quoting *Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del.1996)).

30

## 2. The Derivative Claim Was Not Material

The remaining prong of the *Primedia* inquiry is whether "the value of the derivative claim was material in the context of the merger."[138] This first requires a calculation of the "value" of the claim. Then, materiality is adjudicated by viewing that value in the context of the merger as a whole.

The Complaint alleges that the Derivative Claim was worth "more than $660 million to SEP."[139] The Plaintiff calculates this number as the sum of (1) the difference the Plaintiff alleges between the value of the Pipeline Interests ($1.5 billion) and the value the Plaintiff alleges was received as consideration for the Pipeline Interests from SE Corp ($946 million)[140] and (2) prejudgment interest using the applicable statutory rate.[141]

Previous cases are unclear whether in determining materiality, prejudgment interest should be included in the value of a derivative claim.[142] I presume, without

---

[138] *Id*. at 482.

[139] Compl. ¶ 1.

[140] $554 million, according to the Complaint.

[141] $107 million, according to the Complaint. The Plaintiff notes in his brief that he "conservatively calculated pre-judgment interest only through the July 26, 2018 teleconference" and that "[a]n additional ~$19 million in interest had accrued as of the [Roll Up's] consummation." Pl's Answering Br. in Opp'n to Def.'s Mot. to Dismiss, D.I. 20, at 30 n.28.

[142] *See Primedia*, 67 A.3d at 482 ("[e]ven without interest, a potential recovery of this magnitude would be material in the context of the Merger."); *In re Massey Energy Co.*, 2011 WL 2176479, 27–28 (Del. Ch. May 31, 2011) (prejudgment interest not considered in determining the value of the claim, but such value was held to be limited the total coverage of the company's directors and officers insurance policy).

deciding, that prejudgment interest is a part of the value attributable to the Derivative Claim. I assume that the Derivative Claim, therefore, was for $661 million.[143]

But $661 million is not the value of the Derivative Claim for *Primedia* purposes. Instead, the value of the Derivative Litigation must be "discounted to reflect the minority stockholders' beneficial interest in the litigation recovery."[144] This reflects the fact that the public unitholders of SEP would only share in that portion of the recovery from the Derivative Claim for those units that were not owned by Enbridge prior to the Roll-Up. The Complaint alleges that Enbridge owned "approximately 83% . . . of SEP's limited partner units."[145] This left the minority unitholders with an approximately 17% interest in SEP. $661 million multiplied by 17% equals $112,370,000. I therefore find the value of the Derivative Claim, assuming a 100% chance of recovery, to be $112,370,000.

Yet the Plaintiff faced substantial roadblocks to a $112.37 million judgment, as "there [was] risk in the litigation."[146] It remains, in my view, a litigable question whether Reduced GP Cash Flow represented value to the Partnership in the Reverse Dropdown, which would vindicate the Defendant's approval of the transaction objectively. But even if the Defendant was incorrect in its valuation, that would not

---

[143] $554 million + $107 million.
[144] *Primedia*, 67 A.3d at 482.
[145] Compl. ¶ 1.
[146] *Primedia*, 67 A.3d at 483.

breach the Second A&R LPA. Instead, the Plaintiff would have to show either that the work of the Defendant's advisor, Simmons, on the Reverse Dropdown did not fit in the parameters of Section 7.10(b) of the Second A&R LPA,[147] or that SEP GP did not "reasonably believe" that the valuation of the transaction was within Simmons' competence, negating any "safe harbor" for the Defendant.

Clearing this bar, moreover, would only remove the *conclusive presumption* of good faith. The Plaintiff would still have to demonstrate the Defendant's subjective bad faith to recover damages on behalf of SEP; the Second A&R LPA insulated SEP GP as long as its actions were taken in subjective good faith. To overcome that hurdle the Plaintiff would have had to show scienter: that SEP GP's Board of Directors and the 2015 Committee acted consciously against the best interests of the Partnership.

I find that the chance of success of the Derivative Claim was slim, and certainly less than one-in-four. Twenty-five percent of $112,370,000 is $28,092,500. This represents less than one percent of the total value of the Roll-

---

[147] "The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisors selected by it, and any act taken or omitted to be taken in reliance upon the opinion (including an Opinion of Counsel) of such Persons as to matters that the General Partner reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith in accordance with such opinion." Second A&R LPA § 7.10(b).

Up.[148]  One percent is not material in the context of the Roll-Up.[149]  The Plaintiff

consequently does not have standing to pursue his claims.  Therefore, both Counts I

and II must be dismissed.

## III. CONCLUSION

For the foregoing reasons the Defendant's Motion is granted.  The parties

should submit an Order consistent with this decision.

---

[148] The total value of the Roll-Up was approximately $3.3 billion.  Lindsay Aff. Ex. 4, Spectra Energy Partners, Current Report (Form 8-K) (Aug. 24, 2018) (Excerpt) Ex. 99.1, Enbridge Announces Definitive Agreement to Acquire All Public Equity of Spectra Energy Partners, Advances Corporate Structure Simplification, at 1.

[149] *See In re Massey Energy Co.*, 2011 WL 2176479, *28 (Del. Ch. May 31, 2011) (holding that $95 million was not material in the context of an $8.5 billion merger).